# ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

FILED
U.S. DISTRICT COURT

2010 JAN 25  PM 2: 15

CLERK _L. Flanders_
SO. DIST. OF GA.

LAMONT HOWARD,          )
                        )
        Plaintiff,      )
                        )
    v.                  )        CV 307-045
                        )
TONYA KEMP, et al.,     )
                        )
        Defendants.     )

---

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

---

Plaintiff, an inmate incarcerated at Rutledge State Prison in Columbus, Georgia, commenced the above-captioned case pursuant to 42 U.S.C. § 1983. Plaintiff is *pro se* and is proceeding *in forma pauperis*. This matter comes before the Court on Defendants' motion for summary judgment. (Doc. no. 40). Plaintiff opposes this motion (doc. nos. 46, 47), and Defendants have filed two replies, (doc. nos. 52, 53). For the reasons set forth below, the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** (doc. no. 40), that Plaintiff's motion for consolidation be **DENIED** as **MOOT** (doc. no. 51), that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

# I. STATEMENT OF FACTS

The events forming the basis of this action occurred while Plaintiff was incarcerated at Dodge State Prison ("DSP") in Chester, Georgia. While Plaintiff originally made allegations against other individuals, the only claims that were permitted to proceed were his claims of deliberate indifference against Defendants Tripp and Kemp for their alleged failure to treat his Hepatitis C ("HCV"), and his claim of retaliation against Defendant Sanders regarding his confinement in administrative segregation. (See doc. no. 15, p. 5).

Defendant John Tripp is a doctor and the Medical Director at DSP. (Doc. no. 40, Ex. A, ¶ 3) (hereinafter "Tripp Aff."). As Medical Director, Defendant Tripp's responsibilities include: supervising medical staff at DSP, overseeing inmates' medical care, approving referrals to specialists, providing medical care to inmates, providing medical consultations for other professionals working in the prison system, supervising clinical visits, reviewing inmate grievances, and reviewing and approving treatment protocols, clinical policies, and procedures. (Id. ¶ 4).

Defendant Tonya Kemp is DSP's Health Services Administrator. (Doc. no. 40, Ex. B, ¶ 3) (hereinafter "Kemp Aff."). As Health Services Administrator, her responsibilities include: overseeing the administrative portion of the health care unit at DSP, as well as supervising the medical department heads, including the Medical Director, physician's assistants, nurses, and other health care staff. (Id. ¶ 4). Notably, Defendant Kemp is not authorized to prescribe treatment plans for inmates diagnosed with HCV or other infectious diseases. (Id. ¶ 5). While Defendant Kemp can schedule appointments for inmates to see

DSP medical staff, she does not have the authority to schedule appointments for inmates to see specialists, nor is she authorized to refer inmates to specialists. (Id.).

Defendant Tina Sanders is the Deputy Warden of Care and Treatment at DSP. (Doc. no. 40, Ex. C, ¶ 3) (hereinafter "Sanders Aff."). As the Deputy Warden of Care and Treatment, Defendant Sanders is responsible for ensuring that all care and treatment services in areas such as counseling, education, recreation, medical, mental health, library services, and chaplain services are made available to inmates. (Id. ¶ 4). Defendant Sanders is also responsible for maintaining various facility records and ensuring that those records and other documentation are retained in the ordinary course of business. (Id.).

As to the facts relevant to Plaintiff's deliberate indifference claims against Defendants Tripp and Kemp, Defendant Tripp avers that HCV is a virus that causes the liver to become inflamed and that treatment of inmates with HCV is managed at DSP's Chronic Illness Clinic ("CIC"). (Tripp Aff., ¶ 7). HCV is a disease that progresses slowly, and antiviral treatment is not recommended at the early stages of the disease because once a patient receives antiviral treatment, re-treatment is rarely successful. (Id. ¶ 9). Therefore, beginning treatment too early may do a disservice to a patient who might otherwise benefit from treatment at a later time. (Id.). At DSP, an HCV Pre-Therapy Checklist is used to evaluate whether a patient is a candidate for antiviral treatment, and the information necessary to complete this checklist is obtained from the patient in the CIC. (Id.). Before beginning treatment, all potential candidates for antiviral treatment must undergo a liver biopsy, which shows the extent of damage to the liver from the HCV and is used to determine whether the patient is a candidate for the treatment. (Id. ¶ 10). At DSP, those inmates with HCV who do not qualify for

3

antiviral treatment are continually monitored in the CIC. (Id.). Also of note, alanine aminotransferase ("ALT") is an enzyme in liver cells that is leaked into the bloodstream when the cell is damaged. (Id. ¶ 11). A high level of ALT in the blood indicates liver malfunction, and a persistently high level of ALT is abnormal and indicates that the condition of the liver is worsening. (Id.).

With that medical background in mind, the Court notes that prior to Plaintiff's transfer to DSP from Effingham State Prison ("ESP") on December 28, 2006, Plaintiff had tested positive for HCV. (Tripp Aff., ¶¶ 13, 15 & Attach. 1, p. 98; Kemp Aff., ¶ 8). However, the medical records sent to DSP at the time Plaintiff was transferred did not show that Plaintiff had tested positive for HCV or that he was being transferred for medical reasons; rather, Plaintiff's medical file indicated that he was a healthy inmate, and the only medical issue on his "problem list" was possible glaucoma. (Tripp Aff., Attach. 1, pp. 2, 38; Kemp Aff., ¶¶ 8, 11). Moreover, the Assignment/Transfer Order indicated that Plaintiff was being transferred for administrative reasons, not medical ones. (Sanders Aff., ¶ 8 & Attach. 2; doc. no. 46, Pl.'s Br., Ex. E-8, p. 10).

That said, inmates are not routinely tested for HCV when entering the prison system or when they are transferred between facilities. (Tripp Aff., ¶ 13; Kemp Aff., ¶ 9). Thus, while Plaintiff was examined by a nurse on the day he arrived at DSP, there is no notation from this exam that Plaintiff had tested positive for HCV. (Tripp Aff., ¶ 13 & Attach. 1, p. 36; Kemp Aff., ¶ 9). Notably, Plaintiff's medical records dated January 3, 2007, indicate that Plaintiff could be assigned to any work detail, with no restrictions on his activities. (Tripp Aff., ¶ 14 & Attach. 1, p. 77; Kemp Aff., ¶ 10).

4

On January 16, 2007, Plaintiff was seen by Nurse Tennell at DSP and informed her that he was concerned about being assigned to work detail. (Tripp Aff., ¶ 16 & Attach. 1, p. 35). When Nurse Tennell asked Plaintiff what problems he was having, he denied having any problems and simply stated that he was unable to work. (Id.). The nurse noted that Plaintiff's medical chart did not reflect any medical conditions that would prohibit him from working and again asked if he had any medical complaints. (Id.). Plaintiff again denied having any medical problems and told the nurse that he should not be assigned to work detail. (Id.). On February 28, 2007, Plaintiff saw another nurse after having missed several meals. (Tripp Aff., ¶ 17 & Attach. 1, p. 34). While Plaintiff told this nurse that he had been sent to DSP for medical reasons, the nurse noted that there were no medical problems listed in Plaintiff's chart, other than possible glaucoma. (Id.; Pl.'s Br., ¶ 17). As stated above, the Assignment/Transfer Order indicated that Plaintiff was being transferred for administrative reasons, not medical ones. (Sanders Aff., ¶ 8 & Attach. 2; Pl.'s Br., Ex. E-8, p. 10).

Plaintiff's medical file indicates that he was seen by medical staff five other times while he was incarcerated at DSP, specifically on May 24, 2007, June 5, 2007, June 11, 2007, June 21, 2007, and June 25, 2007. (Tripp Aff., Attach. 1, pp. 29-32, 73). At the May 24th appointment, Plaintiff did request to see a liver specialist, but he gave no indication as to why he needed to see one, and when Plaintiff was asked what kind of symptoms he was having, he did not respond. (Kemp Aff., Attach. 4, pp. 3 & 5). Notably, several of the grievances attached as exhibits to Plaintiff's Brief also indicate that Plaintiff had requested to see a liver specialist on May 24th. (Pl.'s Br., Ex. E-8, pp. 11, 19, 21).

At the June 11th appointment, Nurse Seacrest spoke at length with Plaintiff about a prior request for a complete physical examination. (Tripp Aff., ¶ 20 & Attach. 1, p. 30). Nurse Seacrest told Plaintiff that he was not due for a physical until September 2008,[1] and Plaintiff denied being in any pain or distress. (Id.). Plaintiff repeatedly stated that he had problems, but he refused to describe the nature of his problems and told Nurse Seacrest he did not need to be seen at sick call. (Id.). Plaintiff's medical records from this appointment indicate that he was alert, oriented, and in no visible distress. (Id.).

On June 12, 2007, Plaintiff wrote a letter to Defendant Kemp asking her to retrieve his medical history from ESP. (Kemp Aff., ¶ 22 & Attach. 5). However, Plaintiff did not mention or allude to his positive HCV status in his letter. (Id.). Defendant Kemp avers that Nurse Tennell responded to the letter on her behalf and noted on the letter that she had spoken with Plaintiff and a doctor's appointment had been made for him.[2] (Id.). Defendant Kemp later received a letter from Plaintiff dated June 20, 2007, which again requested that Defendant Kemp obtain his medical history from ESP. (Id. ¶ 23 & Attach. 6). Once again, however, Plaintiff did not mention his HCV positive status in his letter, and Nurse Tennell

---

[1]Pursuant to Georgia Department of Corrections ("GDOC") SOP VH30-0012, an inmate receives a physical every two years unless he has identified a chronic illness or is over 50 years of age. (Kemp Aff., ¶ 17 & Attach. 3). Plaintiff was 45 years old in 2007 (id. ¶ 18), and as noted above, nothing in his medical file indicated that he was HCV positive, nor had Plaintiff informed medical staff of his condition. Thus, based on the information available at the time, Plaintiff was not due for another physical until September 2008, having already had a physical in September 2006. (Id.).

[2]Defendant Kemp states that as Health Services Administrator, she routinely receives letters from inmates and is assisted by the DSP nursing staff in responding to those letters. (Kemp Aff., ¶ 21).

6

again noted on the letter that Plaintiff had a doctor's appointment scheduled for June 25, 2007. (Id.).

That said, on June 20, 2007, Defendant Sanders or someone at her direction ran a query transfer request on Plaintiff.[3] (Sanders Aff., ¶ 8). The query transfer request indicated that Plaintiff had tested positive for HCV at ESP and that ESP had requested a medical transfer for Plaintiff because ESP was not equipped to handle Plaintiff's medical needs. (Id. ¶ 8 & Attach. 2). However, as noted repeatedly above, the request had been approved as an administrative transfer, not a medical one. (Id.). This query transfer request run on June 20th was the first indication to anyone at DSP that Plaintiff had HCV and had been transferred for medical reasons. However, Plaintiff had not personally informed any of the medical staff about his medical condition as of June 20th. Indeed, on June 21, 2007, Plaintiff simply told Nurse Tennell that he wanted to see a specialist about "his illness." (Tripp Aff., ¶ 21 & Attach. 1, p. 29). Plaintiff stated that he did not know if his illness was getting better or worse; however, he declined to tell Nurse Tennell about his illness, telling her he had an upcoming doctor's appointment. (Id.).

On June 25, 2007, Defendant Tripp, who had been informed of Plaintiff's positive HCV status, met with Plaintiff at his scheduled appointment. (Id. ¶ 22 & Attach. 1, pp. 29, 73). At the appointment, Plaintiff told Defendant Tripp that he wanted to see a specialist; however, Plaintiff refused to tell Defendant Tripp about any medical symptoms or provide him with any medical history. (Id.). Plaintiff also refused to allow Defendant Tripp to

---

[3]A query transfer request is a more detailed version of an inmate's movement history. (Sanders Aff., ¶ 8).

examine him, while at the same time demanding to see a specialist. (Id.). Plaintiff admits that he did not tell Defendant Tripp his symptoms and that he would not let Defendant Tripp examine him because he was not a specialist. (Doc. no. 40, Ex. D, pp. 45-47) (hereinafter "Pl.'s Depo."). Defendant Tripp proceeded to inform Plaintiff of the complications that could arise from a refusal of treatment, including worsening of his condition, liver failure, and death. (Tripp Aff., ¶ 22 & Attach. 1, pp. 29, 73). However, Plaintiff refused to sign a refusal of diagnosis and treatment for HCV. (Id.). Defendant Tripp avers that he does not refer inmates to specialists without a physical examination, and in this case, he would have had to examine Plaintiff for jaundice, abdominal discomfort in the right upper quadrant, and inflammation of the liver before referring him to a specialist. (Id. ¶ 23). In part due to Plaintiff's refusal to allow medical staff at DSP to treat him, on June 27, 2007, Plaintiff was referred to Baldwin State Prison for a mental health evaluation. (Id. ¶ 24 & Attach. 1, pp. 124-25). However, it was determined that Plaintiff had no need for mental health services. (Id.).

Despite Plaintiff's failure to communicate with medical staff, Defendant Tripp recommended that Plaintiff be enrolled in the CIC, due to his positive HCV status. (Id. ¶ 25 & Attach. 1, p. 28). Plaintiff was later scheduled for lab tests at DSP on August 22, 2007, which were needed for the Pre-Therapy Checklist and enrollment in the CIC. (Id. ¶ 26 & Attach. 1, pp. 28, 72). However, Plaintiff refused the lab tests and signed a refusal of treatment. (Id.). He also signed a refusal for a doctor's appointment that had been scheduled for August 28, 2007. (Id.). On August 28, 2007, Defendant Kemp noted in Plaintiff's

medical file that she had received a letter from Plaintiff informing her that he did not wish to be seen by any medical staff at DSP. (Id. ¶ 27 & Attach. 1, p. 28; Kemp Aff. ¶ 26).

The next day, on August 29, 2007, Plaintiff was transferred to Calhoun State Prison, where he continued to refuse x-rays, lab tests, and medical appointments. (Tripp Aff., ¶¶ 28, 29 & Attach. 1, pp. 59, 70-71, 103). Plaintiff also refused to enroll in the HCV CIC at Calhoun State Prison and signed a refusal of treatment. (Id. ¶ 29 & Attach. 1, pp. 69, 116-17). Plaintiff continued his pattern of refusing to cooperate with medical staff when he was transferred to Wilcox State Prison in January 2008, Washington State Prison in February 2009, and Autry State Prison in May 2009. (Id. ¶¶ 30-36, 38). That said, Plaintiff did have a liver biopsy performed at Augusta State Medical Prison on April 30, 2009, and lab tests performed on January 28, 2008, February 5, 2008, March 10, 2008, June 23, 2008, and April 29, 2009, revealed ALT levels indicating normal liver function. (Id. ¶¶ 12, 37 & Attach. 1, pp. 88, 91, 93, 95, 189).

The Court next turns to those facts relevant to Plaintiff's retaliation claim against Defendant Sanders. On May 24, 2007, Plaintiff filed an informal grievance against Defendant Sanders, alleging that he was denied a complete physical examination. (Kemp Aff. ¶ 18 & Attach. 2). On June 11, 2007, Plaintiff filed another grievance against Defendant Sanders stating, *inter alia*, that he had requested an examination on "5/22" and to be seen by a liver specialist on "5/24" and "6/02," to no avail. (Id. ¶ 19 & Attach. 4). That said, on July 18, 2007, Defendant Sanders received a letter from Plaintiff in which he referred to Defendant Sanders by her first name. (Sanders Aff., ¶ 10 & Attach. 3). Notably, Plaintiff has admitted writing the letter. (Pl.'s Depo., pp. 80-81). In order to maintain order and discipline

9

and to avoid inmates becoming too familiar with staff, inmates are not permitted to refer to prison staff by their first names. (Sanders Aff., ¶ 10). Accordingly, on July 18, 2007, Defendant Sanders issued Plaintiff a disciplinary report, charging him with insubordination for referring to her by her first name. (Id. ¶ 11 & Attach. 4).

Pursuant to GDOC SOP IIB09-0001, inmates who are issued a disciplinary report are placed in administrative segregation pending a hearing on the charge. (Id. ¶ 12 & Attach. 5 § I(A)). The inmate then has an initial segregation hearing during which the inmate may rebut the placement in administrative segregation. (Id. ¶ 12 & Attach. 5 § VI(B)(1)-(2)). The Classification Committee then makes a recommendation to the warden as to whether the inmate should remain in segregation pending a hearing on the disciplinary report. (Id. ¶ 12). Here, Plaintiff's bed movement history demonstrates that he was placed in administrative segregation on July 19, 2007, the day after the disciplinary report was issued. (Id. ¶ 13 & Attach. 6). Plaintiff's initial segregation hearing was held on July 20, 2007, after which the Classification Committee recommended that Plaintiff remain in administrative segregation pending his hearing on the charge of insubordination. (Id. ¶ 14 & Attach. 7).

On July 24, 2007, Plaintiff's disciplinary hearing was held, and he was sentenced to 14 days in isolation and 60 days of store restriction. (Id. ¶ 15 & Attach. 4). However, Plaintiff received a probated sentence and was released from administrative segregation on July 24th, the same day as his disciplinary hearing. (Id. ¶ 16 & Attach. 8). Defendant Sanders avers that she did not issue the disciplinary report against Plaintiff or place him in segregation because he filed grievances against her. (Id. ¶¶ 17, 18). Rather, the disciplinary report was issued because Plaintiff acted in an insubordinate manner by referring to

10

Defendant Sanders by her first name in a letter that Plaintiff admits writing. (Id. ¶ 17; Pl.'s Depo. pp. 80-81). Furthermore, Defendant Sanders states that Plaintiff was placed in administrative segregation pursuant to GDOC SOP. (Sanders Aff., ¶ 18).

The Court is of course aware that Plaintiff has filed a "Statement of Material Facts" in opposition to Defendants' motion. (See generally Pl.'s Br.). However, this document is merely a recitation of the contents of various documents attached to his Statement, sometimes accompanied by Plaintiff's conclusory parentheticals referencing "neglect," "conspiracy," "retaliation," and "deliberate indifference" on the part of Defendants and other individuals or institutions that are not named as Defendants in this case. (Id. at 5-6). Though Plaintiff has signed this Statement under penalty of perjury (id. at 25), none of the conclusory declarations he makes constitute competent evidence sufficient to contradict the affidavits and supporting documentation provided by Defendants. Moreover, Plaintiff offers nothing except his own allegations in support of his characterizations of the documents attached to his Statement that he contends demonstrate Defendants' liability. However, a review of several of these attachments reveals that Plaintiff has actually mischaracterized their contents.[4] With this background in mind, the Court turns to the merits of Defendants' motion.

---

[4]For example, Plaintiff contends that the disciplinary report issued by Defendant Sanders was a "falsehood" (Pl.'s Br., ¶ 15), but offers no competent evidence to demonstrate that anything contained in the disciplinary report was false. Furthermore, although Plaintiff maintains in his Statement that he requested treatment for HCV in multiple grievances (id. ¶¶ 19, 21), a review of those grievances reveals that Plaintiff simply stated that he requested to see a liver specialist on May 24, 2007, and did not mention his HCV positive status at all, (id., Ex. E-8, pp. 19, 21).

## II. DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate only if "there is no genuine issue as to any material

fact and the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).

Applicable substantive law identifies which facts are material in a given case.[5]  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

When seeking summary judgment, the movant must show, by reference to materials

on file, that there are no genuine issues of material fact to be decided at a trial.  Clark v. Coats

& Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the burden of proof at trial rests with the

movant, to prevail at the summary judgment stage, the movant must show that, "on all the

essential elements of its case . . . , no reasonable jury could find for the nonmoving party."

United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1438 (11th Cir. 1991) *(en banc)*.

On the other hand, if the non-moving party has the burden of proof at trial, the movant may

prevail at the summary judgment stage either by negating an essential element of the non-

moving party's claim or by pointing to specific portions of the record that demonstrate the non-

moving party's inability to meet its burden of proof at trial.  Clark, 929 F.2d at 606-08

(explaining Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) and Celotex Corp. v. Catrett,

477 U.S. 317 (1986)).  Merely stating that the non-moving party cannot meet its burden at trial

---

[5]The Court is mindful that for purposes of summary judgment, only disputes about material facts are important.  That is, "[t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case."  McCormick v. City of Fort Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) (citation omitted).

is not sufficient. Clark, 929 F.2d at 608. Evidence presented by the movant is viewed in the light most favorable to the non-moving party. Adickes, 398 U.S. at 157.

If the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981). Rather, the non-moving party must respond either by affidavits or as otherwise provided in Fed. R. Civ. P. 56. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (quoting Adickes, 398 U.S. at 158-59). A genuine issue of material fact is said to exist "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248.

## B.    Deliberate Indifference Claims

Plaintiff claims that Defendants Tripp and Kemp were deliberately indifferent to his medical needs for failing to treat his Hepatitis C. To survive Defendants' motion for summary judgment on these claims, Plaintiff must produce evidence from which a reasonable jury could conclude: (1) that he had an objectively serious medical need, (2) that Defendants acted with deliberate indifference to that need, and (3) that his injury was caused by Defendants' wrongful conduct. Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007) (citations omitted). Here, Defendants concede that Plaintiff's HCV was a serious medical need. (Doc. no. 40, Defs.' Br., p. 12). Indeed, Dr. Tripp avers that HCV is virus that causes the liver to become inflamed, and Dr. Tripp himself warned Plaintiff that failure to treat it could lead to liver failure

13

or even death. (Tripp Aff. ¶¶ 7, 22 & Attach. 1, pp. 29, 73). That said, Plaintiff has not shown that Defendants acted with deliberate indifference toward that need.

To show that Defendants were deliberately indifferent to his medical needs under the second prong of the Goebert test, Plaintiff must offer some proof that Defendants: (1) were subjectively aware of a serious risk to Plaintiff's health, and (2) that Defendants disregarded that risk by (3) following a course of action which constituted "more than mere negligence." Goebert, 510 F.3d at 1326. In addition, the prisoner plaintiff seeking to show that a delay in medical treatment amounted to deliberate indifference "must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), *abrogated in part on other grounds by* Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)); see also Farrow v. West, 320 F.3d 1235, 1244 n.12 (11th Cir. 2003) ("In Hope v. Pelzer, 536 U.S. 730, 122 S. Ct. 2508, 153 L.Ed.2d 666 (2002), the Supreme Court criticized part of the qualified immunity analysis in Hill, but not Hill's analysis of what constitutes a serious medical need of prisoners.").

Under this standard, Plaintiff's claims of deliberate indifference against Defendants Tripp and Kemp must fail. The record establishes that although Plaintiff had been transferred to DSP for medical reasons, Defendants were not aware of Plaintiff's HCV positive status at the time he was transferred because there was nothing in Plaintiff's medical file at that time demonstrating that he had tested positive for HCV. (Kemp Aff., ¶ 11). Nor did Plaintiff make any of the medical staff aware of his condition, even though staff continually asked him about what medical problems he was having at his medical appointments. (Tripp Aff., ¶¶ 16-

21). For example, when Plaintiff requested a liver specialist in May 2007, Nurse Tennell wrote Plaintiff and asked him why he needed to see a specialist, but Plaintiff refused to respond. (Kemp Aff., Attach. 4, pp. 3 & 5). Simply put, up until the query transfer request was run on June 20, 2007, no one at DSP, including Defendants Tripp and Kemp, was even subjectively aware that Plaintiff was suffering from HCV.

The Court acknowledges that, given the actual reason for Plaintiff's transfer and Plaintiff's efforts to make DSP staff aware that he had been transferred for medical reasons, Defendants perhaps should have known about Plaintiff's positive HCV status before June 20, 2007. However, the Eleventh Circuit has made clear that "a state official acts with deliberate indifference when he disregards a risk of harm of which he is *actually aware*." Ray v. Foltz, 370 F.3d 1079, 1083 (11th Cir. 2004) (emphasis in original) (citing Farmer v. Brennan, 511 U.S. 825, 836 (1994)). Therefore, although Defendants perhaps should have been aware of a serious risk to Plaintiff's health, the record evidence demonstrates that they were not actually aware of his positive HCV status until June 20th, when the transfer query was run. Furthermore, while other individuals may have known about Plaintiff's condition prior to his transfer, Plaintiff has not named these individuals as Defendants, nor has he established that Defendants Tripp and Kemp were subjectively aware of his condition before June 20th. The Court also notes that while Plaintiff stated to multiple nurses that he has been transferred for medical reasons, he never made Defendants Tripp or Kemp aware of this information.

Even if Plaintiff could establish that Defendants were subjectively aware of his positive HCV status, his claim of deliberate indifference against Defendants Tripp and Kemp would still fail. Once Defendant Tripp became aware of Plaintiff's medical condition, he

15

attempted to treat it by exercising his best professional judgment - at no time after this discovery did he ignore Plaintiff's medical needs. However, Plaintiff refused to submit to a physical examination or tell Defendant Tripp any of his symptoms, even though Plaintiff insisted on being referred to a specialist. (Tripp Aff., ¶ 22 & Attach. 1, pp. 29, 73). Based, in part, on Plaintiff's refusal to allow medical staff to treat him, Plaintiff was referred for a mental health evaluation. (Id. ¶ 24 & Attach. 1, pp. 24-25). However, it was determined that Plaintiff had no need for mental health services. (Id.).

Despite Plaintiff's refusal to cooperate with medical staff, Defendant Tripp attempted to have Plaintiff enrolled in the CIC so that his HCV could be treated. (Id. ¶ 25 & Attach. 1, p. 28). Plaintiff was scheduled for lab tests necessary for enrollment in the CIC; however, he refused to undergo those tests and signed a refusal of treatment for those tests, as well as a doctor's appointment. (Id. ¶ 26, pp. 28, 72). Furthermore, Plaintiff wrote Defendant Kemp informing her that he did not wish to be treated by medical staff at DSP, and one day later, Plaintiff was transferred to Calhoun State Prison. (Id. ¶¶ 27, 28 & Attach. 1, p. 28). In short, Defendant Tripp did not act with deliberate indifference toward Plaintiff's medical needs. Rather, he attempted to treat Plaintiff, but Plaintiff continually refused the treatment offered to him. Thus, Plaintiff's claim of deliberate indifference against Defendant Tripp fails.

Plaintiff's deliberate indifference claim against Defendant Kemp fails as well. Defendant Kemp is not a doctor and is not authorized to prescribe treatment plans for inmates with infectious diseases. (Kemp Aff., ¶ 5). Rather, as the Health Services Administrator at DSP, Defendant Kemp is responsible for overseeing the administrative portion of the health care unit and supervising the medical staff. (Id. ¶ 4). Moreover, while Defendant Kemp can

16

schedule appointments for inmates with DSP medical staff, she is not authorized to schedule appointments with specialists or refer inmates to specialists. (Id. ¶ 5). In short, Defendant Kemp is not medically trained, and she is not authorized to do what Plaintiff claims she should have done. While Plaintiff apparently believes that Defendant Kemp should have referred him to a specialist, he has submitted no competent evidence to contradict Defendant Kemp's sworn statement that she is not authorized to schedule appointments with specialists or refer inmates to specialists. Accordingly, Plaintiff has failed to create a genuine issue of material fact with respect to his claim against Defendant Kemp. Thus, based on the facts before the Court, it cannot be said that Defendant Kemp acted with deliberate indifference, and Plaintiff's claim against her fails as well.

The Court also notes that to the extent Plaintiff contends that there was a delay in his medical treatment, he has failed to "place verifying medical evidence in the record" establishing any detrimental effect of the delay. Hill, 40 F.3d at 1188, *abrogated in part on other grounds by* Hope, 536 U.S. at 739 n.9. Moreover, Plaintiff's ALT levels indicated normal liver function on January 28, 2008, February 5, 2008, March 10, 2008, June 23, 2008, and April 29, 2009. (Tripp Aff., Attach. 1, pp. 88, 91, 93, 95, 189). Thus, the evidence in the record in fact demonstrates that there has been no detrimental effect as a result of any delay in treatment that may have occurred, and Plaintiff's claims of deliberate indifference against Defendants Tripp and Kemp fail for this reason as well.[6]

---

[6]As discussed above, the Court is aware that Plaintiff has alleged deliberate indifference by Defendants Tripp and Kemp in conclusory parentheticals contained in his "Statement of Material Facts" submitted in opposition to Defendants' motion for summary judgment. However, Plaintiff's conclusory allegations alone do not establish that Defendants Tripp and Kemp acted with deliberate indifference towards his medical needs. Indeed, at this

## C.    Retaliation Claim

Turning to Plaintiff's retaliation claim, Plaintiff alleges that Defendant Sanders retaliated against him by having him placed in administrative segregation because he filed grievances against her.  In order to prevail on a claim of retaliation, an inmate must establish three elements: "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the . . . allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech."  Smith v. Mosley, 532 F.3d 1270, 1276 (11th Cir. 2008) (citation omitted).  Here, there is no question that Plaintiff's speech was constitutionally protected, as the First Amendment prohibits prisons officials from retaliating against inmates for filing lawsuits or administrative grievances, or for exercising the right of free speech. Farrow, 320 F.3d at 1248; Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986).[7]

Furthermore, the Court finds that placement in administrative segregation following the issuance of a disciplinary report would likely deter the ordinary inmate from filing grievances.  Thus, the only issue left to be decided is whether Plaintiff has established a "causal relationship," which can be shown by "demonstrating that the prison official's actions were 'the result of his having filed a grievance concerning the conditions of his imprisonment.'"

stage, naked accusations are no substitute for evidence and do not defeat summary judgment. See Leigh v. Warner Bros. Inc., 212 F.3d 1210, 1217 (11th Cir. 2000) (conclusory allegations without specific facts in support have no probative value).  Accordingly, Plaintiff has failed to submit any competent evidence indicating that Defendants Tripp and Kemp acted with deliberate indifference.

[7]See also Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995) (per curiam) (noting that prison officials may not burden an inmate's First Amendment rights "with practices that are not reasonably related to legitimate penological objectives" or "act with the intent of chilling that First Amendment right").

Farrow, 320 F.3d at 1248 (citing Wildberger v. Bracknell, 869 F.2d 1467, 1468 (11th Cir. 1989)). The Eleventh Circuit has ruled that "[d]irect evidence of an illegal motive will usually suffice to create a genuine issue of fact and preclude summary judgment." Harris, 65 F.3d at 917.[8] Where a plaintiff has failed to establish a causal connection between his protected conduct and the alleged retaliatory action, summary judgment for the defendant is proper. Farrow, 320 F.3d at 1248-49.

Here, Plaintiff has failed to establish a causal connection between his protected conduct and Defendant Sanders' alleged retaliatory conduct. Indeed, the record reflects that immediately prior to Plaintiff's confinement in administrative segregation, he wrote a letter to Defendant Sanders in which he referred to her by her first name (Sanders Aff., ¶ 10 & Attach. 3), and Plaintiff admits writing that letter to Defendant Sanders, (Pl.'s Depo., pp. 80-81). As discussed above, inmates are not permitted to refer to staff by their first names, in an effort to maintain prison order and discipline and to avoid inmates becoming too familiar with staff. (Sanders Aff., ¶ 11). Accordingly, Defendant Sanders wrote Plaintiff a disciplinary report for insubordination, and Plaintiff was placed in administrative segregation pursuant to GDOC SOP pending his disciplinary hearing. (Id. ¶¶ 11-12 & Attach. 5). Plaintiff was eventually sentenced to 14 days in isolation and 60 days of store restriction. (Id. ¶ 15 & Attach. 4). However, Plaintiff received a probated sentence and was released from administrative segregation on the same day as his disciplinary hearing, which was only 5 days after he was transferred there originally. (Id. ¶¶ 13, 15-16).

---

[8]In Harris, the Eleventh Circuit reversed the district court's decision granting summary judgment where the prisoner plaintiff submitted corroborating affidavits from fellow prisoners that stated a prison official commented that he filed disciplinary reports against the plaintiff, at least in part, in retaliation for prior litigation. Harris, 65 F.3d at 917.

In short, there is no evidence of an "illegal motive" resulting in Plaintiff's placement in administrative segregation. Harris, 65 F.3d at 917. Rather, the record establishes that Plaintiff was placed there pending a disciplinary hearing on a charge of insubordination based on a letter that Plaintiff admits he wrote. (See Pl.'s Depo., pp. 80-81). Moreover, the grievances Plaintiff filed against Defendant Sanders were signed on May 24, 2007, and June 11, 2007. (Kemp Aff., ¶¶ 18-19 & Attach. 2 & 4). However, Plaintiff was not placed in administrative segregation until July 19, 2007. (Sanders Aff., ¶ 13 & Attach. 6). Stated differently, almost two months elapsed between the filing of Plaintiff's first grievance and his placement in administrative segregation, and over a month elapsed between the filing of his second grievance and his placement. Thus, the time span between the filing of Plaintiff's grievances and his placement in administrative segregation counsels against a finding that there was any causal relationship between the filing of Plaintiff's grievances and Defendant Sanders' actions. Rather, the evidence demonstrates that Plaintiff was placed in administrative segregation almost immediately following Defendant Sanders' receipt of the letter referring to her by her first name.

Accordingly, the Court finds that Plaintiff's placement in administrative segregation was a result of his own behavior and not an act of retaliation by Defendant Sanders. While Plaintiff has alleged that Defendant Sanders acted in retaliation in his "Statement of Material Facts," he has provided no proof of this claim. As discussed above, his conclusory allegations of retaliation alone in the parentheticals contained in his Statement do not establish that Defendant Sanders retaliated against him for filing grievances. Indeed, at this stage, naked accusations are no substitute for evidence and do not defeat summary judgment. See Leigh, 212 F.3d at 1217 (conclusory allegations without specific facts in support have no probative

20

value). Accordingly, Plaintiff has failed to submit any competent evidence to create a genuine issue of material fact as to whether Defendant Sanders retaliated against him for filing grievances. Thus, Plaintiff's claim against Defendant Sanders fails as well.[9]

### III. CONCLUSION

For the reasons set forth above the Court **REPORTS** and **RECOMMENDS** that Defendants' motion for summary judgment be **GRANTED** (doc. no. 40), that Plaintiff's motion for consolidation be **DENIED** as **MOOT** (doc. no. 51),[10] that this civil action be **CLOSED**, and that a final judgment be **ENTERED** in favor of Defendants.

SO REPORTED and RECOMMENDED this 25 day of January, 2010, at Augusta, Georgia.

_____
W. LEON BARFIELD
UNITED STATES MAGISTRATE JUDGE

---

[9]The Court's conclusions with respect to Plaintiff's claims of deliberate indifference and retaliation pretermit consideration of Defendants' remaining official capacity, qualified immunity, and injunctive relief arguments. (See Defs.' Br., pp. 18-24).

[10]Plaintiff's motion for consolidation should be **DENIED** as **MOOT** (doc. no. 51), because if the District Judge adopts this recommendation to grant Defendants' motion for summary judgment as the opinion of the Court, there will be no case to consolidate.